John A. Love (FL Bar No. 67224)
LOVE CONSUMER LAW
2500 Northwinds Pkwy Ste 330
Alpharetta, GA 30009
Telephone: (404) 855-3600
Email: tlove@loveconsumerlaw.com

Daniel M. Hattis*
Paul Karl Lukacs*
HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
Telephone: (425) 233-8650
Email: dan@hattislaw.com
Email: pkl@hattislaw.com

Stephen P. DeNittis, Esq.*
DENITTIS OSEFCHEN PRINCE, P.C.
5 Greentree Centre, Suite 410
525 Route 73 N.
Marlton, New Jersey 08057
Telephone: (856) 797-9951
Email: sdenittis@denittislaw.com

* Pro Hac Vice Application To Be Submitted

*Attorneys for Plaintiffs and the Proposed Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| Pamela Ellis; and Laura Dibble, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>CoxCom, LLC,<br><br>        Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

1

Plaintiffs Pamela Ellis and Laura Dibble, individually and on behalf of all others similarly situated, allege as follows, on personal knowledge and investigation of their counsel, against Defendant CoxCom, LLC (hereinafter, "Cox" or "Defendant"):

## I.    **INTRODUCTION**

1.    This action challenges a deceptive pricing and billing scheme whereby Cox falsely advertised and promised to new and existing customers that the monthly prices for Cox's service plans[1] would be at quoted, fixed rates for a 1- or 2-year Service Agreement[2] or Promotional Agreement[3], but then, after the customer signed up, Cox as a matter of policy would unlawfully increase the service price in the middle of the promised fixed-rate period. Notably, Cox's

---

[1] "Service plan" as used in this Complaint refers to a Cox cable service plan with television and/or internet service, including service plans that "bundled" television and/or internet service with phone or home security services.

[2] "Service Agreement" as used in this Complaint means a service plan agreement that is advertised by Cox where the subscriber is promised a quoted, fixed-price promotional rate for a stated period of time, typically for 1 or 2 years, with an early termination fee. The subscriber is free to terminate the agreement at any time, including within the first year; however, if the subscriber terminates service prior to the end of the 1- or 2-year fixed-price period, the subscriber must pay an early termination fee. "Service Agreement" is not used in this Complaint to refer to a specific written contract document. Cox offered Service Agreements both to new customers and to existing customers who were renewing or changing their service plans.

[3] "Promotional Agreement" as used in this Complaint means a service plan agreement that is advertised by Cox where the subscriber is promised a quoted, fixed-price promotional rate for a stated period of time, typically for 1 or 2 years, with no early termination fee. Like in a Service Agreement, the subscriber in a Promotional Agreement is free to terminate the agreement at any time, including within the first year. However, unlike in a Service Agreement, the subscriber in a Promotional Agreement is not required to pay an early termination fee for terminating service prior to the end of the 1- or 2-year fixed-price period. Cox offered Promotional Agreements both to new customers and to existing customers who were renewing or changing their service plans.

deceptive price advertising and practices were uniform in all of Cox's sales channels. According to Cox, consumers would "Get the exact same price when you shop online, by phone or in-store."

2.     For customers who signed up for Service Agreements or Promotional Agreements between 2014 and March 22, 2021, one mechanism that Cox utilized to increase the service rate in the middle of the promised fixed-rate agreement was by annually increasing two disguised monthly television service charges, which Cox called the "Broadcast Surcharge" and the "Regional Sports Surcharge" (the "Surcharges").

3.     Cox advertised and quoted fixed rates for each and every Service Agreement or Promotional Agreement it offered, including a detailed graphical monthly price chart on its website that broke out the price to be charged each and every month for the fixed-price period. Cox promised that for Service Agreements, the quoted fixed prices were "guaranteed." On its website, Cox stated that the "guaranteed" fixed price only excluded equipment, movie rentals, and non-service charges. Notably, those quoted and advertised fixed rates excluded the amount of the Surcharges (and also their increases)—even though the Surcharges were, in fact, monthly "service charges."

4.     Contrary to these promises and representations, a few months after the customer signed up Cox as a matter of policy would covertly increase the monthly service price mid-agreement by raising the Surcharges.

5.     If a customer noticed the price increase to his or her service plan (after the Surcharges had been increased mid-agreement) and called Cox to complain, Cox agents would say that the cause of the increase was the Surcharges and would

falsely state that the Surcharges were pass-through government fees and/or were outside of Cox's control. The Cox agents would also deceptively tell the customer that the service price remained the same because only the Surcharges had increased (despite the fact that the Surcharges were charges for service).

6.    Notably, Cox recently entered into a **$13 million settlement with the Arizona Attorney General** in connection with the unilateral increase of these Surcharges during fixed-rate Service Agreements between January 2015 and March 2021. The Arizona Attorney General's office described the case against Cox as follows when announcing the settlement on January 4, 2024 (emphasis added):[4]

> Attorney General Mayes' lawsuit [filed December 15, 2023] alleged that Cox deceived Arizonans who purchased television services to enter long-term contracts through promises of a "price lock guarantee" and other fixed-pricing "deals." . . . Between January 2014 and March 2021, Cox reserved the ability to regularly raise the bills of price-locked customers through increases in company-imposed fees [of the Broadcast Surcharge and the Regional Sports Surcharge]. . . . **By disguising price increases as fees, Cox routinely raised the bills of customers who thought they had secured a locked-in price**.

7.    Starting March 23, 2021 (the same month that the Arizona Attorney General served its Civil Investigative Demands on Cox concerning Cox's mid-agreement Surcharge increases), Cox modified its new cable TV service plan offerings to eliminate the Broadcast Surcharge and the Regional Sports Surcharge altogether. In their place, Cox immediately increased the base prices of the new

---

[4] *See* Arizona Attorney General press release dated January 4, 2024, "Attorney General Mayes Announces $13 Million Settlement with Cox Communications for Disguising Price Increases as Routine Fees," available at https://www.azag.gov/press-release/attorney-general-mayes-announces-13-million-settlement-cox-communications-disguising (last accessed November 18, 2024).

service plans by an amount equivalent to the Surcharges—which further confirmed that the Surcharges had actually been extra charges for Cox's <u>services</u> all along.

8.    For customers in Promotional Agreements, Cox also utilized a second mechanism to increase rates in the middle of promised fixed-rate agreements: outright raising the base price of the service plan itself.

9.    The investigation of Plaintiffs' counsel found that Cox wrongly implemented the Promotional Agreement pricing in its back-end billing system as a fixed dollar-amount <u>discount</u> off Cox's higher and ever-increasing full list price for the service plan, instead of as the actually promised fixed dollar amount <u>price</u>.

10.    Meanwhile, Cox had a policy and practice of implementing across-the-board increases of the full list price of nearly all of its service plans in the first quarter of each year. And whenever Cox increased the list price, the customer's monthly service price suddenly increased in parallel by the same dollar amount— even in the middle of a promised fixed-price Promotional Agreement.

11.    If customers noticed the price increase in the middle of their Promotional Agreement and called Cox to complain, Cox agents justified the increase by arguing that Cox was honoring the promotion because the subscriber's discount dollar amount had remained the same.[5] But this defied Cox's uniform pre-sale statements, advertisements, and promises (including in detailed monthly price

---

[5] In reality, what Cox had actually advertised and promised to the customer was a fixed specific dollar amount <u>price</u>. At the time of purchase, any advertisements or statements of discounts by Cox were represented as applying to the higher regular price for the service in effect at the time of sign-up, resulting in the quoted and promised lower fixed price. Cox never told or disclosed to the customer that it would instead apply some discount dollar amount to a higher and ever-increasing list price for the service plan (thereby making any represented "discount" amount illusory).

charts) of a quoted fixed rate that would not increase during the promotional period.

12.     Plaintiffs estimate that Cox has extracted more than $90 million from over 700,000 Florida subscribers since 2015 via this illegal scheme of increasing its service prices in the middle of promised fixed-rate agreements.

13.     Plaintiffs bring this lawsuit on behalf of themselves and a class of similarly situated Florida consumers, seeking damages and/or restitution, punitive damages, and pre- and post-judgment interest. Plaintiffs also seek a declaration by this court that Cox's practices alleged herein violate Florida law. Additionally, Plaintiffs, on behalf of themselves and the Class, seek a public injunction to stop these unlawful advertising practices in order to protect the general public.

## II.    **THE PARTIES**

14.     Plaintiff Pamela Ellis is a citizen and resident of Gainesville, Florida, where she was a victim of Cox's deceptive pricing and billing scheme described herein.

15.     From 2015 through May 2020, Plaintiff Laura Dibble was a citizen and resident of Pensacola, Florida, where she was a victim of Cox's deceptive pricing and billing scheme described herein. From May 2020 through January 2022, Ms. Dibble was a citizen and resident of Cantonment, Florida, where she was a victim of Cox's deceptive pricing and billing scheme described herein. Ms. Dibble is currently a resident of Columbus, Missouri.

16.     Defendant CoxCom, LLC is a limited liability company incorporated in Delaware, with its headquarters, executive office, principal place of business and nerve center in Atlanta, Georgia.

III.    **JURISDICTION AND VENUE**

17.    **Subject Matter Jurisdiction.**  The Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d)(2)—i.e., Class Action Fairness Act ("CAFA") jurisdiction—because the amount in controversy exceeds the sum or value of $5 million (exclusive of interest and costs) and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

18.    **Personal Jurisdiction.**  This Court has personal jurisdiction over Cox because, without limitation: (1) Cox has purposely availed itself of the privileges of conducting business activities in Florida; (2) Cox currently maintains systematic and continuous business contacts with Florida including marketing, selling, and issuing service plans to Florida consumers; (3) Cox has entered into agreements with Plaintiffs and other Florida consumers to provide cable TV and internet services; and (4) Cox maintains offices and retail locations throughout Florida and is registered to do business in Florida. Cox has sufficient minimum contacts with Florida to render the exercise of jurisdiction by this Court permissible.

19.    **Venue.**  Venue is proper pursuant to 28 U.S.C. §1391 because many of the acts and transactions giving rise to this action occurred in this District; Cox is authorized to conduct business in this District; Cox does substantial business in this District; Cox has intentionally availed itself of the laws and markets within this District through distribution, marketing and sale of its services in this District; and Cox is subject to personal jurisdiction in this District.

IV.    **FACTUAL ALLEGATIONS OF COX'S DECEPTIVE PRICING AND BILLING SCHEME**

20.    Defendant Cox currently provides cable TV and/or internet services to approximately 6.5 million households nationwide, including approximately 500,000 households in Florida, including in this District and Division.

21.    At all relevant times, Cox has advertised its service plans through pervasive marketing directed at the consuming public in Florida. This marketing has included advertisements on the Cox website; marketing emails; direct mailers; materials and advertising at its Florida retail stores; and internet advertisements.

22.    Cox's price advertising and price representations were uniform in all of Cox's sales channels. According to Cox's statement on its own website, consumers would "Get the exact same price when you shop online, by phone or in-store." See **Figure 1** below (red box added).

**Figure 1:    Cox Statement on Website that Pricing is the Same in All Sales Channels**
(Screenshot from February 28, 2022)



GETTING STARTED WITH COX

- Get the exact same price when you shop online, by phone or in-store.
- The base equipment you need is included for TV, Homelife and Voice plans. Plus, get more from your TV plan with your choice of one premium channel and Record 1 Starter DVR service for 12 months.

23.    For years, Cox falsely advertised, both to consumers who were signing up for the first time, and to existing customers who were renewing or changing their service plans, that the monthly rates for its service plans would be fixed and would not increase above the quoted prices during a 1- or 2-year Service Agreement or Promotional Agreement. For each service plan agreement Cox offered, Cox also advertised on its website a detailed graphical monthly price chart that broke out the quoted price to be charged each and every month for the fixed-

price period.

24.    But then after the customer signed up, Cox—in violation of its representations and agreement with the customer—would as a matter of policy unlawfully increase the service rate in the middle of the promised fixed-rate period.

25.    Below are further details regarding how Cox implemented its unlawful price increases in the middle of promised and agreed-to fixed-rate periods.

**A.    <u>Raising the Broadcast Surcharge and the Regional Sports Surcharge Mid-Agreement.</u>**

26.    For customers who signed up for Service Agreements or Promotional Agreements between 2014 and March 22, 2021, one mechanism that Cox utilized to increase the service rate in the middle of the promised fixed-rate agreement was by annually increasing two disguised monthly television service charges, which Cox called the "Broadcast Surcharge" and the "Regional Sports Surcharge" (the "Surcharges").

27.    These mid-agreement increases were contrary to the fixed service prices previously quoted and promised by Cox agents and were contrary to the advertisements on the Cox website at sign-up.

28.    In addition to making these affirmative misrepresentations about Cox's service prices, Cox failed to adequately disclose the existence of the Surcharges during the signup process. And Cox <u>never</u> disclosed the fact that Cox could and would use the Surcharges as a way to increase the price of its service plans mid-agreement, directly contrary to Cox's representations and promises of quoted fixed rates.

29.    Notably, Cox recently entered into a **$13 million settlement with the Arizona Attorney General** in connection with the unilateral increase of these Surcharges during fixed-rate Service Agreements between January 2015 and March 2021.[6]

30.    The Arizona Attorney General's office described the case against Cox as follows when announcing the settlement on January 4, 2024 (emphasis added):[7]

> Attorney General Mayes' lawsuit [filed December 15, 2023] alleged that Cox deceived Arizonans who purchased television services to enter long-term contracts through promises of a "price lock guarantee" and other fixed-pricing "deals." . . . Between January 2014 and March 2021, Cox reserved the ability to regularly raise the bills of price-locked customers through increases in company-imposed fees [of the Broadcast Surcharge and the Regional Sports Surcharge]. . . . **By disguising price increases as fees, Cox routinely raised the bills of customers who thought they had secured a locked-in price.**

### 1.    The Broadcast Surcharge and the Regional Sports Surcharge.

31.    The Broadcast Surcharge is a monthly television service charge that Cox started adding in January 2015 to customer invoices. The Broadcast Surcharge began in January 2015 at a rate of $4.00 per month. Between January 2017 and December 2022, Cox increased the Broadcast Surcharge at least seven times, typically in the month of January. Currently, the Broadcast Surcharge is $27.00 per

---

[6] The Arizona Attorney General had served its Civil Investigative Demands on Cox on March 5, 2021. Later that same month, Cox modified its new cable TV service plan offerings to eliminate the Broadcast Surcharge and the Regional Sports Surcharge.

[7] *See* Arizona Attorney General press release dated January 4, 2024, "Attorney General Mayes Announces $13 Million Settlement with Cox Communications for Disguising Price Increases as Routine Fees," available at https://www.azag.gov/press-release/attorney-general-mayes-announces-13-million-settlement-cox-communications-disguising (last accessed November 21, 2024).

month.

32.    The Regional Sports Surcharge is another, separate, monthly television service charge that Cox started adding in January 2017 to customer invoices. The Regional Sports Surcharge was charged to Cox subscribers with "Contour TV" (previously called "Essential TV") or higher—which comprised the overwhelming majority of Cox cable TV subscribers. The Regional Sports Surcharge began in January 2017 at approximately $4.00. Between January 2018 and December 2022, Cox increased the Regional Sports Charge several times, typically in the month of January. Currently, the Regional Sports Surcharge is $11.50 per month.

33.    The only billing document that named or listed the Surcharges was the full version of the customer bill. But Cox did not send the full customer bill to any of its customers. Customers could only view the full bill by logging into their account on the Cox website and then clicking on a maze of hyperlinks.

34.    Cox did not name or mention the existence of the Broadcast Surcharge or the Regional Sports Surcharge when customers signed up, whether on the phone, online, or in-store. Cox also did not name or mention the existence of the Surcharges on its order confirmation emails. Cox did not name or mention the existence of the Surcharges in its emailed invoices or on the "Summary Bill" that Cox mailed to customers who requested billing by postal mail.

35.    Meanwhile, on the full version of the customer bill (which most customers did not see), Cox buried the Broadcast Surcharge and the Regional Sports Surcharge at the end of the "Monthly Services" section under "Additional TV." And Cox did not define or explain the Surcharges anywhere on the bill.

36.    Cox increased the Broadcast Surcharge and the Regional Sports Surcharge regardless of whether the customer was in the middle of a "guaranteed" fixed-rate and "price-locked" Service Agreement or Promotional Agreement. Cox used the Surcharges as a way to covertly increase the monthly service price for its plans during a customer's promised fixed-rate Service Agreement or Promotional Agreement.

37.    Starting March 23, 2021 (the same month that the Arizona Attorney General served its Civil Investigative Demands on Cox concerning its mid-agreement Surcharge increases), Cox modified its new cable TV service plan offerings nationwide, including in Florida, to eliminate the Broadcast Surcharge and the Regional Sports Surcharge altogether.[8] In their place, Cox increased the prices of the new service plans by an amount equivalent to the Surcharges—which further confirmed that the Surcharges had actually been extra charges for Cox's <u>services</u> all along.

### 2.    <u>Cox Advertised and Promised "Guaranteed" Fixed Monthly Rates During Service Agreements.</u>

38.    Cox consistently and prominently advertised and promised fixed quoted rates for each Service Agreement service plan, including a detailed monthly price chart on its website that broke out the price to be charged each and every month for the fixed-price period.

39.    Cox promised that the service plan rates were "guaranteed" not to

---

[8] Cox continued to charge the Surcharges to customers who signed up for their existing service plan prior to March 23, 2021, and Cox continued to increase the Surcharges in the middle of promised fixed-rate Service Agreements and Promotional Agreements that were entered into prior to March 23, 2021.

increase and were "price-locked" during the Service Agreement. On its website, Cox stated that the "guaranteed" fixed price excluded only equipment, movie rentals, and non-service charges. However, those advertised fixed rates, including the prices promised in the month-by-month price charts, excluded the amount of the Surcharges (and also their increases)—even though the Surcharges were, in fact, monthly "service charges."

40.    Customers who signed up for 1- or 2-year Service Agreements agreed to pay an early termination fee if they terminated the agreement during the promised fixed-price period. Customers were willing to enter into Service Agreements because Cox had represented that in return, Cox would charge no more than the quoted fixed price during the promotional period.

41.    **Cox's Online Advertising and Order Process.**  On Cox's website and throughout the online order process, Cox repeatedly—and falsely—represented that signing up for a 1- or 2-year Service Agreement "guaranteed" that the advertised and promised monthly service price would be locked-in for the duration of the 1- or 2-year term.

42.     For example, on Cox's FAQ webpages (see **Figure 2** below), one of the questions asked: "What if I don't want a service agreement?" Cox's posted answer to the question was: **"Service agreements give you peace of mind that your bill won't change over the course of the agreement**, but you can opt out during checkout for $10 more per month." (Emphasis added.)

**Figure 2:    Cox FAQ on Service Agreement**
(Screenshot from January 9, 2020)



∧ **What if I don't want a service agreement?**

Service agreements give you peace of mind that your bill won't change over the course of the agreement, but you can opt out during checkout for $10 more per month.

43.     Throughout the online order process, Cox made explicit representations about the quoted and "guaranteed" fixed price of the service plan under the Service Agreement. For example, see **Figure 3** below, which is representative of what Cox displayed from at least 2018 through March 22, 2021, to consumers during the online ordering process after they had selected one of Cox's advertised offers.[9] (Red boxes added.)

---

[9] This screenshot was taken from, and present on, the Cox website on January 9, 2020, during the online order process for the "Cox Bronze Bundle with Homelife" 2-year Service Agreement plan promotion.

**Figure 3:    Cox Online Order Process Webpage**
(Screenshot from January 9, 2020)



44.      As the screenshot above shows, Cox advertised fixed "Monthly Charges" of **"$99.99/mo For 12 months"**, which was a clear promise that the monthly service charges would stay fixed at $99.99 per month for the first 12 months of the Service Agreement.

45.      And if the customer clicked the link to "see <u>Offer Terms</u>" then a box popped up on the screen where Cox again promised that the price for the

customer's service plan would not increase above the quoted rates during the promotional period. See **Figure 4** below.

**Figure 4:    Term Service Agreement Tab of "See Offer Terms" Pop-Up**
(Screenshot from January 9, 2020)



46.    Indeed, as shown in both Figures 3 and 4, Cox repeatedly advertised and promised: "The Service Agreement lets you **guarantee the regular rates** on Cox TV, Internet and Phone services for 2 years. The rates for your **services will not increase above the Service Agreement rate** when you agree to keep your main services (TV, Internet and/or Phone) for the 2 years." (Emphasis added.) Immediately below that, Cox stated: "**What's covered and not covered.** The Service Agreement is offered on TV, Internet and Phone services plus their features, such as a premium channel or voice mail. The Service Agreement does not apply to charges for equipment (such as a receiver or modem), per use items

(like a movie rental) and fees for non-services (like taxes and surcharges) which may change."

47.    Cox promised that its fixed price "guarantee" excluded only equipment, movie rentals, and "fees for <u>non-services</u>" (emphasis added). Yet Cox has admitted that the Broadcast Surcharge and the Regional Sports Surcharge are fees for <u>services</u> (see ¶¶ 57–62 below), such that this fine print "non-services" exception cannot apply to mid-agreement increases to the Broadcast Surcharge and the Regional Sports Surcharge.

48.    If the consumer clicked on the "Pricing Details" tab in the same pop-up box shown in Figure 4 above, then Cox would display a graphical monthly price chart which listed the dollar amount Cox would charge each and every month for service. See **Figure 5** below (red box added).

**Figure 5:** **Monthly Price Chart (Pricing Details Tab of "See Offer Terms" Pop-Up)**



49.      As the chart shows, Cox promised that Cox would charge $99.99 each month under the service plan. The fine print at the bottom stated that the $99.99 price "[i]ncludes applicable monthly recurring service fees." However, contrary to Cox's assertion, the $99.99 price did not include the amount of the Broadcast Surcharge or Regional Sports Surcharge, nor any increases to those Surcharges—despite the fact that the Surcharges were indisputably "monthly recurring service fees."

50.      All of these pricing representations described above and documented in Figures 2–5 above are typical and representative of Cox's uniform price representations and advertising since 2014 to its customers nationwide, including

in the state of Florida.

51.   **Signing up with Cox sales or customer service agents.**  Likewise, when new or existing customers, including Plaintiffs, signed up for Cox service over the phone, via web-chat, or in-store, Cox sales and customer service agents quoted the exact same prices for the exact same service plans as on the Cox website, and made the exact same promises about fixed-rate prices under a Service Agreement. As Cox stated on its website, "Get the exact same price when you shop online, by phone or in-store." (See Figure 1 above.)

52.   Cox sales and customer service agents promoted Service Agreements by making the same promises to consumers as on the website: that the advertised service rates were "guaranteed" and "price-locked" for the 1- or 2-year promotional period. Meanwhile, Cox agents as a matter of policy did not disclose or mention that Cox could, and would, increase the monthly service price mid-agreement by increasing the Broadcast Surcharge and/or the Regional Sports Surcharge. And, even though it was possible to request to sign up for month-to-month service (at a higher price) rather than a 1- or 2-year Service Agreement, Cox agents were trained to not mention the month-to-month option unless a customer specifically asked for it.

> **3.**   **Cox Increased the Monthly Service Rate Mid-Agreement by Raising the Broadcast Surcharge and the Regional Sports Surcharge.**

53.   Cox's representations that the monthly service rate was "guaranteed" and "price-locked" and that its Service Agreements "give you peace of mind that your bill won't change over the course of the agreement" were false. To the contrary, Cox as a matter of uniform policy routinely increased the monthly price

for its services in the middle of its customers' fixed-rate agreements by increasing the two disguised television service fees—the Broadcast Surcharge and the Regional Sports Surcharge.

54.    Cox increased the Broadcast Surcharge at least seven times since 2015, and increased the Regional Sports Surcharge several times since 2017. And Cox imposed these annual increases on all of its cable TV subscribers, even if they were in the middle of a promised fixed-rate agreement.

55.    Contrary to Cox's fixed-price "guarantee" and promise that the service rate was "price-locked" during the Service Agreement, Cox utilized the Broadcast Surcharge and the Regional Sports Surcharge as levers to covertly ratchet up the service price in the middle of the agreement.

56.    Meanwhile, customers in Service Agreements who discovered and were upset about the price increases could not terminate their agreements without having to pay a significant early termination fee (under the agreement, they could quit at any time during the promotional period, but would have to pay the termination fee to do so).

**4.    It Is Indisputable That the Broadcast Surcharge and the Regional Sports Surcharge Are Charges for Service.**

57.    It cannot be disputed that the Broadcast Surcharge and the Regional Sports Surcharge are extra charges for cable TV service. In fact, Cox has repeatedly admitted that the Surcharges are charges for services.

58.    Notably, Cox listed the Broadcast Surcharge and Regional Sports Surcharge in the "Monthly Services" section of the full version of the customer bill (which most customers did not receive or see) under "Additional TV"—where they

were neither defined nor explained. Cox did not list the Broadcast Surcharge or the Regional Sports Surcharge under the separate section of the bill labeled "Taxes, Fees and Surcharges."

59.    Cox has repeatedly confirmed that the Broadcast Surcharge and the Regional Sports Surcharge are just carved-out portions of the customer's cable TV service price. In fact, prior to 2015 those current Surcharge amounts were included in the top-line service plan price.

60.    For example, in one discussion thread on Cox's website, a Cox representative stated that:[10]

> In the past, all Cox television programming costs and fees were simply rolled together in our charges for Advanced TV service or the specific Tier of service. Over the years, Cox has had to raise service rates due to rising video programming costs and network retransmission fees. In an effort to meet the demand for more transparent billing practices, we introduced surcharges as a way to highlight the different costs associated with the delivery of broadcast TV networks. The separate line items simply allow customers to better track how these costs impact their total TV charge.

61.    These admissions further confirm that the Broadcast Surcharge and the Regional Sports Surcharge are extra television service charges.

---

[10] *See* Cox website at: https://forums.cox.com/discussions/archive/to-keep-you-better-informed-a-6-00-surcharge-what/95525, last accessed November 21, 2024 (emphasis added). Meanwhile, the Cox representative's explanation that the Surcharges were implemented by Cox to be "more transparent" in its billing practices and to "highlight" the cost of delivery of the broadcast networks is specious nonsense—in fact, the opposite is true. Cox actually utilized the Surcharges as a way to deceive its customers regarding the true cost of its service plans. Cox enticed customers to sign up by falsely advertising a lower price while utilizing the Surcharges to then covertly charge a higher price. Cox's advertising and quoted prices excluded the amount of the Surcharges altogether, and then Cox never defined or explained—even in the full version of the customer bill—what the Broadcast Surcharge or Regional Sports Surcharge were.

62.    And when Cox stopped charging the Surcharges to subscribers of its new cable TV service plans beginning March 23, 2021—and Cox instead on that same day immediately increased the top-line price of its advertised TV service plans by an equivalent dollar amount—Cox was further admitting that the Surcharges had really just been disguised extra charges for TV service all along.

### B.    Outright Raising the Base Price of the Service Plan Mid-Agreement.

63.    For those customers in Promotional Agreements, Cox also utilized a second mechanism to increase rates in the middle of promised fixed-rate agreements: outright raising the base price of the service plan itself.

### 1.    Cox Advertised and Promised Promotional Agreements With Fixed Monthly Rates.

64.    Cox advertised and promised, like Cox did for its Service Agreements, that consumers who signed up for Promotional Agreements would enjoy a fixed service price for the promotional period of 1 or 2 years.

65.    **Online Advertising and Order Process.**  Cox's website uniformly and consistently advertised Promotional Agreement service plans at quoted fixed prices. For example, below at **Figure 6**, Cox advertised a Promotional Agreement service plan as being **"$139.99/mo for 24 mos. No term agrmt."**:[11]

---

[11] This screenshot was taken from, and present on, the Cox website on July 13, 2021, and lists advertised Cox service plans with a 2-year fixed price Promotional Agreement. The $139.99/mo service plan on the left was labeled by Cox as the "Internet Preferred 150 + Contour TV Preferred" plan. This screenshot is representative of how Cox has advertised Promotional Agreement service plans on its website since at least March 23, 2021.

**Figure 6:    Cox Website Advertisement for Promotional Agreement Service Plans**



66.    Throughout the online order process for Promotional Agreement service plans (just like Cox did for Service Agreement plans as described above), Cox advertised a quoted fixed rate to be charged during the Promotional Agreement period.

67.    Likewise, Cox advertised and displayed a graphical monthly price chart in the "See Offer Terms" pop-up box for Promotional Agreement plans, just like Cox did for its Service Agreement plans (as demonstrated in Figure 5 above).

68.    For example, below at **Figure 7** is a graphical monthly price chart for a Promotional Agreement service plan that was viewed by a particular consumer on Cox's website on May 11, 2023 (red boxes added). This consumer ultimately purchased on that same day, May 11, 2023, the bundled Internet and TV service plan advertised in Figure 7 as being **"$105.99/mo"** for 24 months. Figure 7 consists of 3 images which together display the "Monthly Charges" as they appeared when scrolling down within the price chart to display all of Months 1–

24.[12]

**Figure 7:    Monthly Price Chart for Promotional Agreement Plan (May 2023)**

(3 scrolling screenshots display 24 months of quoted monthly charges)



---

[12] These screenshots were taken from, and present on, the Cox website on May 11, 2023, and show the monthly price chart for Cox's "Internet Preferred 250 + Contour TV Starter" plan with a 2-year fixed price Promotional Agreement. This monthly price chart is representative of how Cox has advertised and listed its Promotional Agreement service plans on its website since at least March 23, 2021.





69.    The text above the price chart reads: **"Promotional discounts begin and end, but that shouldn't mean that your amount due each month should be a surprise. Learn how this offer's discounts will affect your monthly rate."**

And then in the line-by-line monthly price chart below that, Cox promised to charge the same service price of $105.99 for each and every one of the 24 months of the promotional period.

70.    The pricing representations and price charts described above and documented in Figures 6 and 7 above are typical and representative of Cox's uniform price representations and advertising of Promotional Agreements since 2014 to its customers nationwide, including in the state of Florida.

71.    **Signing up with Cox sales or customer service agents.**  Meanwhile, new or existing customers, including Plaintiffs, who signed up on the phone, via web chat, or in-store with a Cox agent for a Promotional Agreement service plan were presented with the exact same fixed-rate representations and promises. As described above, Cox stated on its website that customers would "Get the exact same price when you shop online, by phone or in-store" (see Figure 1 above). And consistent with Cox's website advertising, Cox agents promised consumers that the monthly service price would be a quoted fixed dollar amount—e.g., "$105.99/mo"—that would not increase during promotional period (just like the agents promised regarding Service Agreements).

> **2.**    **Contrary to its Promises, Cox Increased the Service Price in the Middle of Fixed Price Promotional Agreements By Outright Increasing the Base Price of the Service Plan Itself.**

72.    For customers in Promotional Agreements, Cox also breached its fixed-price promises via the mechanism of outright raising the base price of the service plan in the middle of the promised fixed-rate period.

73.    Cox did so even though the price increase defied Cox's explicit pre-

sale statements, advertisements, and promises—including in the detailed monthly price charts—that the monthly price would remain at the quoted fixed rate for the duration of the promotional period.

74.    For example, directly contrary to Cox's advertising and graphical monthly price chart for the "$105.99/mo" 24-month Promotional Agreement service plan described above at ¶¶ 68–69 and Figure 7, in Month 9 Cox outright increased the monthly price to this subscriber by $5.00 (to $110.99).

75.    Below at **Figure 8** is the Month 8 (December 2023) bill of this subscriber who signed up on May 11, 2023 for the "$105.99/mo" service plan shown in the screenshots above at Figure 7. (Red boxes, red lines, and black arrows added.) The bill, consistent with the prior bills from Month 1 (May 2023) through Month 7 (November 2023), showed a "Total Monthly Services" price of $105.99, as had been advertised and displayed at sign-up on the price chart (see Figure 7 above).

**Figure 8:    In Months 1–8 Cox Charged the Promised Fixed Rate of $105.99/mo**

**Example: December 2023 Customer Bill**
(Month 8 of 24-Month $105.99 Agreement)

**Price Chart at Sign-Up on 5/11/2023 (See Fig. 7)**







76.     Then, in January 2024, Cox implemented its annual company-wide price increases for nearly all of its service plans. Cox implemented these company-wide service price increases across-the-board to all of its subscribers—<u>even if they were in a promised fixed-rate Promotional Agreement</u>.

77.     Regarding this particular subscriber (as described above at ¶¶ 68–69), Cox increased the price of his bundled TV and internet service plan, despite the subscriber being in the middle of a promised fixed rate period. Specifically, Cox increased the "Contour TV Starter" portion of the bundled service plan, from $56.00 to $61.00.

78.     Thus on the subscriber's January 2024 bill (Month 9 of the subscriber's 24-month $105.99/mo fixed-rate agreement), the subscriber's monthly service price was increased by $5.00, to $110.99/mo. This increased price was directly contrary to Cox's explicit pre-sales advertisements and promises (including the monthly price chart), and in breach of Cox's agreement with the subscriber. See **Figure 9** below. (Red boxes, red lines, and black arrows added.)

**Figure 9:   In Month 9, Cox Unlawfully Raised the Subscriber's Promised Fixed Rate by $5.00 (to $110.99/mo)**



### January 2024 Customer Bill
(Month 9 of 24-Month $105.99 Agreement)

### Price Chart at Sign-Up on 5/11/2023 (See Fig. 7)
(Promised $105.99/mo fixed rate for all 24 months
Contour TV Starter portion was $56.00/mo)





79. When the subscriber had signed up 9 months earlier, Cox had promised "Promotional price: $105.99" (the total for both the TV and internet portions of the bundled service plan) for all 24 months. Below that Cox had listed the $105.99 price as the "Monthly Charge" on 24 separate rows of its monthly price chart—one for each of the months 1 through 24. (See Figure 9 above at the top of the price chart on the right side.) Cox had assured the subscriber that the monthly prices Cox charged during the agreement would therefore not "be a surprise" (see Figure 9 at the top of the price chart). In fact, Cox's $5.00 price increase in the middle of the 24-month fixed-rate agreement was not only "a surprise"—it was also in breach of, and directly contrary to, Cox's promises and explicit representations at sign-up.

80. During the first quarter of every year, Cox has implemented its annual company-wide price increases for nearly all of its service plans. And as Figures 7–9 above illustrate, Cox has implemented these price increases across-the-board to its subscribers—even if they were in a promised fixed-rate Promotional Agreement.

81. Cox's unlawful mid-agreement price increase to this subscriber (documented at Figures 7–9 above) is representative and typical of how Cox regularly and unlawfully breached its fixed-price agreements with millions of Promotional Agreement subscribers, including hundreds of thousands of Florida consumers.

82. Counsel's investigation found that, contrary to Cox's advertising and the statements of its sales and customer service agents, Cox actually implemented Promotional Agreement pricing in its back-end billing system as a fixed dollar

amount <u>discount</u> off of Cox's higher and ever-increasing full list price for the service plan (and not as the fixed dollar amount <u>price</u> that Cox actually advertised and promised).[13] And whenever Cox increased the list price of the service plan, then the customer's monthly service price suddenly increased in parallel by the same dollar amount—even in the middle of a promised fixed-rate promotional period.

83.    Consequently, Cox's advertisements and representations were and remain false and contrary to Florida law. Moreover, by failing to provide its services at the price promised by Cox and agreed to by its customers for the duration of the Promotional Agreements, Cox has breached its agreements with each and every customer in violation of Florida law.

### C.    <u>Cox Concealed Its Price Increases and Deceived Customers After They Signed Up.</u>

84.    Cox continued to deceive its customers concerning its mid-agreement price increase scheme after they signed up.

85.    Cox concealed its mid-agreement price increases by implementing them several months into the service agreement—and not on the first bill, which a customer would have been more likely to find and examine after first signing up. Customers would not expect that, contrary to Cox's representations and promises, several months into the agreement Cox would then suddenly increase the

---

[13] In reality, any advertisements or statements of discounts to customers by Cox were represented as applying to the regular price for the service in effect at the time of sign-up, resulting in the quoted and promised lower fixed price. (E.g., see the Cox price chart examples at Figures 5 and 7 above.) Cox never told or disclosed to the customer that Cox would instead apply some discount dollar amount to the higher and ever-increasing full list price for the service plan (thereby making any represented "discount" amount illusory).

supposedly fixed price (either by raising the Surcharges, or by raising the base price of the service plan itself).

86.     Meanwhile, most customers did not read the full version of the customer bill (which was the only billing document that named or listed the Surcharges or their amounts). In fact, Cox did not send the full version of the customer bill to any of its customers.

87.     The overwhelming majority of Cox customers were signed up by default for paperless billing. Those customers only received a short summary invoice email each month (the full bill was not attached) that merely listed the total amount due. Customers could not tell from the invoice email that Cox had increased their monthly service rate (e.g., by increasing the Broadcast Surcharge and/or Regional Sports Surcharge, or by increasing the base price of the service plan itself), because no mention was made of any increases. And because the net increases were relatively small compared to a customer's total monthly bill, even if the customer saw the invoice email, the customer would typically not notice the increase.

88.     Further, the majority of Cox's customers were also signed up for automatic payments (which Cox calls "EasyPay"), such that their bill was paid automatically regardless of whether they saw the monthly invoice email.

89.     Even if a customer who was not signed up for EasyPay logged into the Cox website to make a payment, Cox would not present the customer with a full version of the customer bill. When the customer logged in, Cox presented the customer only with the total dollar amount due, next to a big colorful button labeled "Make a payment." The only way a customer could find and view the

customer bill was to click on the single word "Billing" which was on the webpage (but which was not on a menu and which was not even an obvious hyperlink). Then, on the next webpage, the customer would need to click on "View statements." Then, on the following webpage, the customer would need to find the link to the relevant bill, and then finally click on the link to open and view the bill.

90.    Cox did not even send the full version of the customer bill to those few customers who requested that Cox send them their bills by postal mail. Since at least 2018, Cox has only sent those customers by mail what Cox calls a "Summary Bill." The printed "Summary Bill" (unlike the full version of the bill) only contains billing totals and does not contain details about the service or charges. For example, the Summary Bill does not even list or state the amount of the Broadcast Surcharge or the Regional Sports Surcharge. Meanwhile, the full version of the customer bill containing this information is _only_ available online on Cox's website after the customer logs in as described in the previous paragraph.

91.    With regard to mid-agreement increases to the Broadcast Surcharge and the Regional Sports Surcharge, the increases were relatively small—typically between $0.50 to $3.50 per Surcharge. Given that taxes and other government-related charges can vary by small amounts from month to month, Cox knew that customers may reasonably expect small changes in the total amount invoiced each month and would not notice that Cox increased the service price by increasing the amount of these disguised service charges.

92.    Meanwhile, even if a customer did somehow find and view the full version of the customer bill (which was only available online), Cox never defined or explained the Broadcast Surcharge or the Regional Sports Surcharge on the bill.

If a customer noticed the Surcharges or an increase to the Surcharges, the reasonable customer would assume, as Cox intended (and as Cox agents would falsely tell the customer if asked), that the Surcharges were pass-through government fees and/or were outside of Cox's control.

93.     Likewise, with regard to the mid-agreement increases to the base price of the service plan, the increases were relatively small, typically between $2.00 to $5.00. Even if a customer in a Promotional Agreement somehow found and viewed the full version of the customer bill, Cox did not provide any information there that would notify or remind the customer that he or she was in a Promotional Agreement at all. Cox likewise did not state on the full version of the customer bill when the current pricing would end.

94.     As described above, Cox's billing practices were designed to reduce the likelihood that customers would discover the mid-agreement price increases.

95.     In the event a customer somehow did discover a mid-agreement price increase and called Cox to complain, Cox would lie to the customer to prevent him or her from learning the truth about Cox's deceptive scheme.

96.     With regard to mid-agreement Surcharge increases, Cox agents would respond to complaining customers that the Surcharges were pass-through government fees and/or were outside of Cox's control. The Cox agents would also deceptively tell the customers that the service price remained the same because only the Surcharges had increased (despite the fact that the Surcharges were actually charges for service).

97.     With regard to the increase of the service plan base price during a Promotional Agreement, Cox agents would respond to complaining customers by

arguing that their promotional <u>discount</u> dollar amount had remained the same (i.e., from Cox's higher and ever-increasing full list price for the service plan). But this defied Cox's explicit pre-sale statements, advertisements, and promises that the quoted monthly <u>price</u> (e.g., "$105.99/mo") would remain at the initially quoted rates and not increase during the Promotional Agreement.

## V.    PLAINTIFFS' FACTUAL ALLEGATIONS

### Plaintiff Pamela Ellis

98.    At all relevant times herein, Plaintiff Pamela Ellis was a citizen and resident of Gainesville, Florida, where she was a victim of Cox's deceptive pricing and billing scheme described herein. Ms. Ellis continues to reside in Gainesville, Florida.

99.    Ms. Ellis was a subscriber of Cox cable TV and internet services in Florida for more than 20 years until she cancelled her Cox services in May 2021.

100.    Ms. Ellis typically signed up for and renewed her service plans over the telephone with Cox. In the process of researching her service plan options, Ms. Ellis also visited the Cox website and viewed Cox's advertising regarding its fixed price service plan agreements (similar to that described above at ¶¶ 41–49, 65–69), which was consistent with the promises and pricing that Cox agents told her over the phone.

101.    Ms. Ellis signed up for Promotional Agreements and Service Agreements with Cox since 2015. Each time that Ms. Ellis signed up for a Promotional Agreement or Service Agreement, Cox affirmatively told her that the service price would be an advertised and promised fixed dollar amount that would not increase for the duration of the 1- or 2-year promotional period.

102.   But contrary to Cox's promises, at least once during each Promotional Agreement or Service Agreement that Ms. Ellis signed up for, Cox increased the price of her service plan.

103.   **March 9, 2018, 1-Year Promotional Agreement.** For example, in March 2018, Ms. Ellis called Cox to learn about her service plan options. The Cox agent she spoke to quoted and promised Ms. Ellis a fixed-price TV and internet bundled service plan at a rate of approximately $125.00 per month under a 1-year Promotional Agreement that would begin March 9, 2018. The agent promised and assured Ms. Ellis that the service plan price would not increase during the term of the agreement. Relying on Cox's fixed price representations and promises, Ms. Ellis signed up for the service plan.

104.   But contrary to Cox's promises, in January 2019 (10 months into her 12-month fixed-price agreement), Cox increased the monthly price of her service plan by: (1) increasing the Broadcast Surcharge by $2.50 (from $7.50 to $10.00); and (2) increasing the Regional Sports Surcharge by at least one dollar.

105.   **March 26, 2019, 2-Year Promotional Agreement.** For example, in March 2019, Ms. Ellis called Cox to learn about her service plan options. The Cox agent she spoke to quoted and promised Ms. Ellis a fixed-price TV and internet bundled service plan at a rate of approximately $130.00 per month under a 2-year Promotional Agreement that would begin March 26, 2019. The agent promised and assured Ms. Ellis that the service plan price would not increase during the term of the agreement. Relying on Cox's fixed price representations and promises, Ms. Ellis signed up for the service plan.

106.   But contrary to Cox's promises, in January 2020 (10 months into her

24-month fixed-price agreement), Cox increased the monthly price of her service plan by: (1) increasing the Broadcast Surcharge by $3.50 (from $10.00 to $13.50); and (2) increasing the Regional Sports Surcharge by at least one dollar.

107. Then in January 2021 (22 months into her 24-month fixed-price agreement), Cox again, contrary to its promises, increased the monthly price of her service plan, this time by: (1) increasing the Broadcast Surcharge by $2.50 (from $13.50 to $16.00), and (2) increasing the Regional Sports Surcharge by at least one dollar.

108. When Ms. Ellis signed up for the Promotional Agreements and Service Agreements, she was relying on Cox's explicit representations that the monthly service rate would be the quoted and advertised dollar amount and would not increase during the term of the agreement. Ms. Ellis did not know or expect that contrary to Cox's promises and representations, Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate term. That information would have been material to her. If Ms. Ellis had known that information, she would not have been willing to pay as much for her service plans and would have acted differently.

109. Ms. Ellis never agreed to pay increases to the price of the service plan during the terms of the Promotional Agreements or Service Agreements.

110. Ms. Ellis never noticed that Cox had increased the amount of the Surcharges in the middle of her Promotional Agreements or Service Agreements, and Ms. Ellis never agreed to such Surcharge increases.

111. Ms. Ellis first learned of Cox's mid-agreement price increase scheme and that she was a victim of the scheme in July 2024, when she signed a retainer

agreement with her attorneys. As a result of Cox's intentional misconduct, omissions, affirmative misrepresentations, and intentional concealment throughout the customer lifecycle as described herein, Cox's deceptive pricing and billing scheme was non-obvious and intentionally concealed from its subscribers, including Ms. Ellis.

112.    Ms. Ellis suffered damages during her Promotional Agreements and Service Agreements in the amount of the increases to her promised and quoted fixed monthly service price.

113.    Ms. Ellis is an ordinary consumer who is unsophisticated with regard to the interpretation and application of legal contracts.

114.    Ms. Ellis has a legal right to rely now, and in the future, on the truthfulness and accuracy of Cox's representations and advertisements regarding its service plan prices. Ms. Ellis will be harmed in the future by her inability to rely on the truthfulness and accuracy of Cox's representations and advertisements regarding its service prices. Ms. Ellis desires to sign up for Cox service plans in the future. However, Ms. Ellis wants to be confident that the advertised and quoted fixed-rate prices for Cox's service plans are in fact truly fixed for the duration of the Promotional Agreement or Service Agreement.

**Plaintiff Laura Dibble**

115.    From 2015 through May 2020, Plaintiff Laura Dibble was a citizen and resident of Pensacola, Florida, where she was a victim of Cox's deceptive pricing and billing scheme described herein. From May 2020 through January 2022, Ms. Dibble was a citizen and resident of Cantonment, Florida, where she was a victim of Cox's deceptive pricing and billing scheme described herein. Ms.

Dibble is currently a resident of Columbus, Missouri.

116. Ms. Dibble was subscriber of Cox cable TV and internet services in Florida for over 6 years until she cancelled her Cox services on January 28, 2022.

117. Ms. Dibble typically signed up for and renewed her service plans over the telephone with Cox. In the process of researching her service plan options, Ms. Dibble also visited the Cox website and viewed Cox's advertising regarding its fixed price service plan agreements (similar to that described above at ¶¶ 41–49, 65–69), which was consistent with the promises and pricing that Cox agents told her over the phone.

118. Ms. Dibble signed up for Service Agreements and Promotional Agreements with Cox since 2015. Each time that Ms. Dibble signed up for a Service Agreement or Promotional Agreement, Cox affirmatively told her that the service price would be an advertised and promised fixed dollar amount that would not increase for the duration of the 1- or 2-year promotional period.

119. But contrary to Cox's promises, at least once during each Service Agreement or Promotional Agreement that Ms. Dibble signed up for, Cox increased the price of her service plan.

120. **May 29, 2020, 2-Year Service Agreement.** For example, around May 29, 2020, Ms. Dibble called Cox to learn about her service plan options. The Cox agent she spoke to quoted and promised Ms. Dibble a fixed-price TV and internet bundled service plan at a rate of approximately $135.00 per month under a 2-year Service Agreement that would begin May 29, 2020. The agent promised and assured Ms. Dibble that the service plan price would not increase during the term of the agreement. Relying on Cox's fixed price representations and promises,

Ms. Dibble signed up for the service plan.

121.   But contrary to Cox's promises, in January 2021 (8 months into her 24-month fixed-price agreement), Cox increased the monthly price of her service plan by: (1) increasing the Broadcast Surcharge by $2.50 (from $13.50 to $16.00); and (2) increasing the Regional Sports Surcharge by at least one dollar.

122.   Then in January 2022 (20 months into her 24-month fixed-price agreement), Cox again, contrary to its promises, increased the monthly price of her service plan, this time by: (1) increasing the Broadcast Surcharge by $3.00 (from $16.00 to $19.00); and (2) increasing the Regional Sports Surcharge by at least one dollar.

123.   On January 28, 2022, Ms. Dibble terminated her Cox services when she moved to Columbus, Missouri (which is outside of Cox's geographic service area) to care for her mother. Ms. Dibble paid an early termination fee because she terminated the contract prior to the end of the two-year fixed-rate period (which would have ended May 28, 2022).

124.   When Ms. Dibble signed up for the Service Agreements and Promotional Agreements, she was relying on Cox's explicit representations that the monthly service rate would be the quoted and advertised dollar amount and would not increase during the term of the agreement. Ms. Dibble did not know or expect that contrary to Cox's promises and representations, Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate term. That information would have been material to her. If Ms. Dibble had known that information, she would not have been willing to pay as much for her service plans and would have acted differently.

125.   Ms. Dibble never agreed to pay increases to the price of the service plan during the terms of the Service Agreements or Promotional Agreements.

126.   Ms. Dibble never noticed that Cox had increased the amount of the Surcharges in the middle of her Service Agreements or Promotional Agreements, and Ms. Dibble never agreed to such Surcharge increases.

127.   Ms. Dibble first learned of Cox's mid-agreement price increase scheme and that she was a victim of the scheme in July 2024, when she signed a retainer agreement with her attorneys. As a result of Cox's intentional misconduct, omissions, affirmative misrepresentations, and intentional concealment throughout the customer lifecycle as described herein, Cox's deceptive pricing and billing scheme was non-obvious and intentionally concealed from its subscribers, including Ms. Dibble.

128.   Ms. Dibble suffered damages during her Service Agreements and Promotional Agreements in the amount of the increases to her promised and quoted fixed monthly service price.

129.   Ms. Dibble is an ordinary consumer who is unsophisticated with regard to the interpretation and application of legal contracts.

130.   Ms. Dibble has a legal right to rely now, and in the future, on the truthfulness and accuracy of Cox's representations and advertisements regarding its service plan prices. Ms. Dibble will be harmed in the future by her inability to rely on the truthfulness and accuracy of Cox's representations and advertisements regarding its service prices. Ms. Dibble desires to sign up for Cox service plans in the future if she is in Cox's geographic service area. However, Ms. Dibble wants to be confident that the advertised and quoted fixed-rate prices for Cox's service

plans are in fact truly fixed for the duration of the Service Agreement or Promotional Agreement.

## VI.    **CLASS ALLEGATIONS**

131.    Plaintiffs bring this lawsuit as a class action, on behalf of themselves and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

132.    **Class Definition.**  Plaintiffs seek certification of the following class:

> **All current and former Cox subscribers in Florida who signed up for a Service Agreement[14] or Promotional Agreement[15] and whose service price was increased in the middle of the agreement period above the initially quoted rates.**

133.    This Court should apply the **<u>discovery rule</u>** to extend any applicable limitations period (and the corresponding Class period) for the Plaintiffs and each Class member to January 1, 2015—which is the date, based on counsel's

---

[14] "Service Agreement" as used in this Complaint means a service plan agreement that is advertised by Cox where the subscriber is promised a quoted, fixed-price promotional rate for a stated period of time, typically for 1 or 2 years, with an early termination fee. The subscriber is free to terminate the agreement at any time, including within the first year; however, if the subscriber terminates service prior to the end of the 1- or 2-year fixed-price period, the subscriber must pay an early termination fee. "Service Agreement" is not used in this Complaint to refer to a specific written contract document. Cox offered Service Agreements both to new customers and to existing customers who were renewing or changing their service plans.

[15] "Promotional Agreement" as used in this Complaint means a service plan agreement that is advertised by Cox where the subscriber is promised a quoted, fixed-price promotional rate for a stated period of time, typically for 1 or 2 years, with no early termination fee. Like in a Service Agreement, the subscriber in a Promotional Agreement is free to terminate the agreement at any time, including within the first year. However, unlike in a Service Agreement, the subscriber in a Promotional Agreement is not required to pay an early termination fee for terminating service prior to the end of the 1- or 2-year fixed-price period. Cox offered Promotional Agreements both to new customers and to existing customers who were renewing or changing their service plans.

investigation, that Cox first engaged in its deceptive and unlawful practice of increasing its service prices in the middle of advertised and promised fixed-rate agreements. The nature of Cox's misconduct was non-obvious and intentionally concealed from its subscribers. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle, neither Plaintiffs nor the members of the Class could have, through the use of reasonable diligence, learned of the accrual of their claims against Cox at an earlier time.

134.    Specifically excluded from the Class are Cox and any entities in which Cox has a controlling interest, Cox's agents and employees, the bench officers to whom this civil action is assigned, and the members of each bench officer's staff and immediate family.

135.    **Numerosity.**  The number of members of the Class are so numerous that joinder of all members would be impracticable. Plaintiffs do not know the exact number of class members prior to discovery. However, based on information and belief, the Class comprises hundreds of thousands of individuals. The exact number and identities of Class members are contained in Cox's records and can be easily ascertained from those records.

136.    **Commonality and Predominance.**  All claims in this action arise exclusively from the uniform policies and procedures of Cox as outlined herein. This action involves multiple common legal or factual questions which are capable of generating class-wide answers that will drive the resolution of this case. These common questions predominate over questions affecting individual Class members, if any. These common questions include, but are not limited to, the

following:

       a.     Whether Cox advertised and promised that the monthly price of its service plans would be fixed and would not increase above the initially-quoted rates during 1- or 2-year Service Agreements or Promotional Agreements;

       b.     Whether Cox increased its monthly service prices in the middle of Service Agreements and Promotional Agreements by raising the Broadcast Surcharge and/or Regional Sports Surcharge, or by raising the base price of the service plan itself;

       c.     What is the nature or purpose of the Broadcast Surcharge and the Regional Sports Surcharge, and whether the Surcharges are monthly service fees for providing cable TV service;

       d.     Whether increases to the Broadcast Surcharge and the Regional Sports Surcharge are increases to the price of the monthly service;

       e.     Whether Cox's policy and practice of increasing the monthly service price in the middle of promised and advertised fixed-price Service Agreements or Promotional Agreements is material information, such that a reasonable consumer would find that information important to the consumer's purchase decision;

       f.     Whether it was a breach of contract for Cox to unilaterally increase the monthly service price in the middle of promised and advertised fixed-price Service Agreements or Promotional Agreements above the initially quoted rates;

       g.     Whether Cox violated the covenant of good faith and fair dealing by increasing the monthly service price in the middle of Service

Agreements or Promotional Agreements by raising the Broadcast Surcharge and/or Regional Sports Surcharge, or by increasing the monthly service price in the middle of Promotional Agreements above the initially quoted rates by raising the base price of the service plan itself;

h.    **Whether** Cox was unjustly enriched by its misconduct alleged herein;

i.    Whether Cox's misrepresentations and misconduct alleged herein violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq*.;

j.    Whether Plaintiffs and the Class are entitled to refunds and/or damages as a result of Cox's misconduct alleged herein; and

k.    Whether Plaintiffs and the Class are entitled to an order enjoining Cox from continued engagement in the misconduct alleged herein.

137.    **Typicality.**  Plaintiffs' claims are typical of Class members' claims. Plaintiffs and Class members all sustained injury as a direct result of Cox's uniform practices and schemes alleged herein, bring the same claims, and face the same potential defenses.

138.    **Adequacy.**  Plaintiffs and their counsel will fairly and adequately protect Class members' interests. Plaintiffs have no interests antagonistic to Class members' interests and are committed to representing the best interests of the Class. Moreover, Plaintiffs have retained counsel with considerable experience and success in prosecuting complex class action and consumer protection cases.

139.    **Superiority.**  A class action is superior to all other available methods for fairly and efficiently adjudicating this controversy. Each Class member's

interests are small compared to the burden and expense required to litigate each of his or her claims individually, so it would be impractical and would not make economic sense for Class members to seek individual redress for Cox's conduct. Individual litigation would add administrative burden on the courts, increasing the delay and expense to all parties and to the court system. Individual litigation would also create the potential for inconsistent or contradictory judgments regarding the same uniform conduct. A single adjudication would create economies of scale and comprehensive supervision by a single judge. Moreover, Plaintiffs do not anticipate any difficulties in managing a class action trial.

140.   By its misconduct and omissions alleged herein, Cox has acted and refused to act on grounds that apply generally to the Class, such that final declaratory relief and injunctive relief is appropriate respecting the Class as a whole.

141.   Without the proposed class action, Cox will likely retain the benefits of its wrongdoing and will continue the complained-of practices, which will result in further damages to Plaintiffs and class members.

142.   No lawsuit, cause of action, claim, cross-claim or counterclaim alleged within this pleading was filed primarily because of or is based upon: Cox's written or oral statement made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work; Cox's written or oral statement made before a governmental entity in connection with an issue under consideration or review by a governmental entity; or Cox's exercise of the right to peacefully assemble, to instruct representatives of government, or to petition for redress of grievances. No

lawsuit, cause of action, claim, cross-claim or counterclaim alleged within this
pleading lacks merit.

## CAUSES OF ACTION

### COUNT I

### Violation of the Florida Deceptive and Unfair Trade Practices Act
### Fla. Stat. §§ 501.201, *et seq.*

143.    Plaintiffs reallege and incorporate by reference all paragraphs
previously alleged herein.

144.    Plaintiffs bring this cause of action in their individual capacities and
as representatives of the Class.

145.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),
Fla. Stat. §§ 501.201, *et seq.*, is Florida's principal consumer protection statute.
The FDUTPA broadly declares unlawful all "[u]nfair methods of competition,
unconscionable acts or practices, and unfair or deceptive acts or practices in the
conduct of any trade or commerce." Fla. Stat. § 501.204(1).

146.    The FDUTPA allows "a person who has suffered a loss as a result of
a violation of this part" to bring an action to "recover actual damages, plus
attorney's fees and court costs." Fla. Stat. § 501.211(2). The FDUTPA also permits
a person to obtain declaratory and injunctive relief. Fla. Stat. § 501.211(1).

147.    By its conduct and omissions alleged herein, Cox has engaged in
unfair or deceptive acts or practices in violation of the FDUTPA, including:

a.      Misrepresenting that the prices of its service plans were fixed
and would not increase during 1- or 2-year Service Agreements or Promotional
Agreements, despite Cox's pattern and practice of increasing service prices mid-

agreement;

b.    Increasing the prices of its service plans in the middle of promised fixed-price Service Agreements or Promotional Agreements, contrary to Cox's previous representations and advertising;

c.    Falsely stating to complaining customers who noticed the Broadcast Surcharge and/or Regional Sports Surcharge and increases thereto, that the Surcharges were pass-through government fees and/or were outside of Cox's control; and

d.    Falsely stating to complaining customers who noticed price increases to their Promotional Agreement service plans, that the price increases were justified because the subscriber's promotional discount dollar amount (from Cox's ever-increasing "retail rate") had remained the same, when in fact Cox's explicit pre-sale representations and advertisements promised that the monthly price would remain the same.

148.   With respect to any omissions, Cox at all relevant times had a duty to disclose the information in question because, inter alia: (a) Cox had exclusive knowledge of material information that was not known to Plaintiffs and the Class members; (b) Cox concealed material information from Plaintiffs and the Class members; and (c) Cox made partial representations, including regarding the supposedly fixed monthly rate of its service plans, which were false and misleading absent the omitted information.

149.   The unfair or deceptive acts or practices alleged herein to have been undertaken by Cox were all committed intentionally and knowingly. The unfair or deceptive acts or practices alleged herein to have been undertaken by Cox did not

result from a bona fide error notwithstanding the use of reasonable procedures adopted to avoid such error.

150.    Cox's misrepresentations deceive and have a tendency to deceive the general public.

151.    Cox's misrepresentations are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

152.    Plaintiffs and the Class members reasonably relied on Cox's material misrepresentations, and would not have purchased, or would have paid less money for, Cox's service plans had they known the truth.

153.    By its conduct and omissions alleged herein, Cox caused the demand for its service plans to be artificially increased and caused all subscribers of those plans, including Plaintiffs and the Class members, to pay premiums to Cox.

154.    As a direct and proximate result of Cox's violations of the FDUTPA, Plaintiffs and the Class members have been harmed and lost money or property in the amount of the mid-agreement price increases they were charged and paid, and have thereby suffered actual damages.

155.    Plaintiffs seek an order awarding actual, statutory, and/or punitive damages, and equitable relief (including restitution and/or disgorgement) to Plaintiffs and Class members in an amount to be proved at trial. Plaintiffs further seek an award of attorneys' fees and costs.

156.    Cox's conduct and omissions alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and the Class members. Perpetrating a years-long scheme of misleading

and overcharging customers is immoral, unethical, and unscrupulous. Moreover, Cox's conduct is oppressive and substantially injurious to consumers. By its conduct alleged herein, Cox has improperly extracted over $90 million from Florida consumers. There is no utility to Cox's conduct, and even if there were any utility, it would be significantly outweighed by the gravity of the harm to consumers caused by Cox's conduct alleged herein.

157.   Plaintiffs lack an adequate remedy at law to prevent Cox's continued unlawful practices. Plaintiffs will be harmed in the future by their inability to rely on the truthfulness and accuracy of Cox's representations and advertisements regarding its service prices. Plaintiffs desire and intend to sign up for different Cox service plans and Service Agreements or Promotional Agreements in the future if they are within Cox's service area. However, Plaintiffs want to be confident that the advertised and quoted fixed-rate prices for Cox's service plans are in fact truly fixed for the duration of the Service Agreement or Promotional Agreement. Plaintiffs want to be confident that Cox is not going to increase the service price during any promised fixed-rate period. Plaintiffs will be harmed if, in the future, they are left to guess as to whether Cox's representations are accurate.

158.   Monetary damages are not an adequate remedy at law for <u>future</u> harm for the following reasons, without limitation: First, damages are not an adequate remedy for future harm because they will not prevent Cox from continuing its unlawful conduct. Second, damages for future harm cannot be calculated with certainty and thus cannot be awarded. For example, it is impossible to know: (1) what service plans Plaintiffs may want or need in the future; (2) what will be the dollar amounts by which Cox increases the price of the services mid-agreement; or

(3) how many months Plaintiffs would subscribe to such Cox services. Because these factors are unknown, damages are impossible to calculate and cannot be awarded for future harm. Third, injunctive relief is necessary (and monetary damages do not provide a plain, adequate and complete remedy) because, without forward-looking injunctive relief enjoining the unlawful practices, the courts may be flooded with future lawsuits by the general public, Class members, and Plaintiffs for future violations of the law by Cox.

159.    Cox's misconduct is ongoing in part or in whole and even if such conduct were to cease, it is behavior that is capable of repetition or re-occurrence by Cox absent a permanent injunction.

160.    Accordingly, pursuant to FDUTPA, Plaintiffs and the Class members are also entitled to an injunction to halt Cox's unlawful practices described herein.

## COUNT II

## **Breach of Contract**

161.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

162.    Plaintiffs bring this cause of action in their individual capacities and as representatives of the Class.

163.    By the uniform conduct alleged herein, Cox has breached its contracts with Plaintiffs and the members of the Class, who have sustained damages as a result of said breaches.

164.    Specifically, Cox entered into contracts with Plaintiffs and the members of the Class in which Cox promised that the monthly prices for Cox's

service plans would be at a specific quoted and fixed rate for a 1- or 2-year Service Agreement or Promotional Agreement, but then, after the customer signed up, Cox as a matter of policy would breach that contract by increasing the service price in the middle of the promised fixed-rate period. Thus, Cox unilaterally charged Plaintiffs and the members of the Class more money than they had agreed and contracted to pay for Cox service plans during the specified time periods.

165.   Plaintiffs and the members of the Class have performed, for the relevant time frame, all of each's material obligations under the contract or have been excused from any non-performance.

166.   Cox breached the contract by raising the monthly service price in the middle of its fixed-rate Service Agreements or Promotional Agreements with Plaintiffs and the members of the Class.

167.   Plaintiffs and the members of the Class sustained damages as a result of Cox's breaches of contract. Plaintiffs seek damages in the amount they and the members of the Class paid in mid-agreement price increases to their promised fixed-price service plans.

## COUNT III

### Breach of Implied Covenant of Good Faith and Fair Dealing

168.   Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

169.   Plaintiffs bring this cause of action in their individual capacities and as representatives of the Class.

170.   Plaintiffs allege this cause of action in the alternative to Count II.

171.   To the extent any applicable contract could be read as granting Cox discretion to increase the price of a customer's service plan in the middle of a promised fixed-rate Service Agreement or Promotional Agreement—which Plaintiffs do not concede—that discretion is not unlimited, but rather is limited by the covenant of good faith and fair dealing implied in every contract by Florida law.

172.   Cox has violated the covenant of good faith and fair dealing by its conduct alleged herein.

173.   Specifically, Cox has abused any discretion it purportedly had under any applicable contract to raise the monthly price of its service plans above the initially quoted and agreed-to rates in the middle of promised fixed-rate Service Agreements or Promotional Agreements. For example:

a.     Cox misrepresented in its advertising and in its communications with consumers that the prices of its service plans were fixed and would not increase above the initially quoted rates during 1- or 2-year Service Agreements or Promotional Agreements;

b.     Through the conduct alleged herein, Cox unilaterally and surreptitiously increased the prices of its service plans in the middle of promised fixed-rate periods over and above the promised and advertised rates which its customers agreed to pay;

c.     With regard to customers in Service Agreements, Cox required that customers agree to early termination fees in order to discourage customers from canceling their services if they learned that Cox had increased the price of their services above the initially quoted rates in the middle of promised fixed-rate

agreements;

   d. With regard to mid-agreement Surcharge increases, if any customers discovered that their service plans had increased in price and called Cox to complain, Cox agents would say that the cause of the increase was the Surcharges and would falsely state that the Surcharges were pass-through government fees and/or were outside of Cox's control. The Cox agents would also deceptively tell the customer that the service price remained the same because only the Surcharges had increased (despite the fact that the Surcharges were charges for service); and

   e. With regard to the increase of the service plan base price during a Promotional Agreement, if any customers discovered the price increases and called Cox to complain, Cox agents would justify the increases by arguing that the customer's promotional <u>discount</u> dollar amount (from Cox's higher and ever-increasing full list price for the service plan) had remained the same, even though Cox's explicit pre-sale representations and advertisements promised that the monthly <u>price</u> would remain the same.

 174. Cox's mid-agreement increases to the service price above the initially-quoted rates were contrary to Cox's representations and promises, defied customers' reasonable expectations, were objectively unreasonable, and frustrated the basic terms of the parties' agreement. Cox's conduct alleged herein was in bad faith.

 175. Cox's conduct described herein has had the effect, and the purpose, of denying Plaintiffs and the Class members the full benefit of their bargains with Cox.

176.   Plaintiffs and the members of the Class have performed all, or substantially all, of the obligations imposed on them under any applicable agreements with Cox. There is no legitimate excuse or defense for Cox's conduct.

177.   Any attempts by Cox to defend its mid-agreement service price increases above the initially quoted rates through reliance on supposed contractual provisions will be without merit. Plaintiffs and the members of the Class never knowingly agreed to any such provisions, are not subject to them, or the provisions are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and/or are unenforceable in light of the hidden and deceptive nature of Cox's misconduct, among other reasons. Any such provisions, even if they existed, would not excuse Cox's abuses of discretion or otherwise preclude Plaintiffs and the members of the Class from recovering for breach of the covenant of good faith and fair dealing.

178.   Plaintiffs and the members of the Class sustained damages as a result of Cox's breaches of the covenant of good faith and fair dealing. Plaintiffs seek damages in the amount they and the members of the Class paid in service price increases above the initially quoted rates, which were imposed by Cox in the middle of their Service Agreements and Promotional Agreements.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and proposed Class, ask this Court to:

A.      Declare that Cox's conduct alleged herein violates the laws cited above;

B.      Certify the case as a class action and appoint Plaintiffs and their counsel to represent the Class;

C.      Order that the discovery rule applies to extend any applicable limitations periods (and the corresponding class period) for the Class to the date on which Cox first began the alleged unlawful practices, which based on the investigation of Plaintiffs' counsel is January 1, 2015;

D.      Declare that Cox is financially responsible for notifying all Class members of Cox's deceptive and unconscionable business practices alleged herein;

E.      Permanently enjoin Cox from engaging in the misconduct alleged herein;

F.      Retain jurisdiction to monitor Cox's compliance with the permanent injunctive relief;

G.      Order disgorgement and/or restitution, including, without limitation, disgorgement of all revenues, profits and/or unjust enrichment that Cox obtained, directly or indirectly, from Plaintiffs and Class members as a result of the unlawful conduct alleged herein;

H.      Order Cox to hold in constructive trust all payments received from Plaintiffs and Class members with respect to the unlawful practices alleged herein;

I.      Order Cox to perform an accounting of all such payments;

J.      Enter judgment in favor of Plaintiffs and Class members for actual

damages suffered as a result of the conduct alleged herein;

K.      Order Cox to pay punitive, exemplary, treble, and/or statutory

damages to the Plaintiffs and Class members under the laws outlined herein;

L.      Order Cox to pay attorneys' fees and costs to the extent allowed by

law;

M.      Order Cox to pay pre-judgment and post-judgment interest to the

extent allowed by law; and

N.      Grant such other and further legal and equitable relief as the Court

deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

PLEASE TAKE NOTICE that the Plaintiffs hereby demand a trial by jury

on all issues so triable.

Date: November 27, 2024

Presented by:

LOVE CONSUMER LAW

By:   */s/ John A. Love*

John A. Love (FL Bar No. 67224)
2500 Northwinds Pkwy Ste 330
Alpharetta, GA 30009
Telephone: (404) 855-3600
Email: tlove@loveconsumerlaw.com

Daniel M. Hattis*
Paul Karl Lukacs*
HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
Telephone: (425) 233-8650

Email: dan@hattislaw.com
Email: pkl@hattislaw.com

Stephen P. DeNittis, Esq.*
DENITTIS OSEFCHEN PRINCE, P.C.
5 Greentree Centre, Suite 410
525 Route 73 N.
Marlton, New Jersey 08057
Telephone: (856) 797-9951
Email: sdenittis@denittislaw.com

\* Pro Hac Vice Application To Be Submitted

*Attorneys for Plaintiffs and the Proposed Class*